**Nathan Robert SEARS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 5464.**

Supreme Court of Wyoming.

Aug. 24, 1981.

Michael H. Schilling, Appellate Counsel, Wyo. Public Defender Program, Laramie, Sylvia Lee Hackl, Asst. Public Defender, Wyo. Public Defender Program, Cheyenne, for appellant.

Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., and John W. Renneisen, Asst. Atty. Gen., Cheyenne, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

ROONEY, Justice.

Appellant was convicted, after a jury trial, of the crime of burglary with intent to commit third degree sexual assault in violation of § 6–7–201, W.S.1977.[1] He words the issues on appeal as follows:

"Whether the trial court erred in denying Appellant's Motion to suppress the complaining witness' identification of him since the totality of circumstances surrounding the pre-trial identifications was so impermissibly suggestive as to create a substantial likelihood of irreparable misidentification and thus deprive Appellant of due process of law.

"Whether Wyoming's Third Degree Sexual Assault Statute is unconstitutionally vague in that men of common intelligence must guess at its meaning and differ as to its application which is viola-

tive of the basic principles of due process of law."

We affirm.

The person referred to by appellant as the "complaining witness" (hereinafter referred to as "victim") was a 17-year-old unmarried female, who was living with her parents in an apartment in Cheyenne. During the early morning hours of June 9, 1980, she awakened to find a man, naked from the waist down, standing beside her bed. She testified that he was wearing a "baseball hat style" and a navy blue sweat shirt. About eight or ten seconds after she awoke, he pulled his sweat shirt over the lower half of his face. When she would try to talk, he would put a gag over her mouth. She testified that he took her hand and placed it on his penis, "wanting me to rub him and stuff, and I would pull away and he would grab me back"; that he then ordered her to kiss his penis but she turned her head away. She testified that her mother then called her name, and the man ran from her room and from the house.

## PROPRIETY OF IDENTIFICATION

A short time after the incident, the police encountered a man in the neighborhood and took him to the front of victim's apartment house. She viewed him from a window of the apartment house at a distance of about 25 to 30 feet and said he was not the assailant. A few minutes later, the police brought appellant, whom they also found in the neighborhood, to the same place where victim viewed him in like manner. She identified him as her assailant.

At the trial, victim also identified appellant as her assailant.

In *Reinholt v. State*, Wyo., 601 P.2d 1311, 1313 (1979), we said:

"* * * [W]e recently addressed the propriety of such pre-court identification in

1. Section 6–7–201, W.S.1977, provides in pertinent part:

"(a) Whoever, intentionally enters, or attempts to enter, any of the following places without the consent of the person in lawful possession and with intent to steal or commit

a felony therein may be imprisoned not more than fourteen (14) years:
"(i) Any building or dwelling; or
    *    *    *    *    *    *
"(v) A room within any of the above."

*Campbell v. State*, Wyo., 589 P.2d 358 (1979). We there examined the current status of the law relative thereto and made reference to the pertinent authorities. It would be redundant to again review the matter here except to note the conclusions therein reached relative to the issue. We there concluded that the consideration is whether or not there is a very substantial likelihood of irreparable misidentification upon a *totality of the circumstances*; that the pretrial identification evidence is admissible if it possesses features of reliability[2] despite a suggestive aspect; and that in making the determination of reliability, the following factors should be weighed against the corrupting effect of the suggestive identification itself:

"1. Opportunity of the witness to view the criminal at the time of the crime;

"2. The witness' degree of attention;

"3. The accuracy of his prior description of the criminal;

"4. The level of certainty demonstrated at the confrontation; and

"5. The time between the crime and the confrontation." (Emphasis in original.)

It is difficult to find any "suggestiveness" with reference to the first identification. The victim viewed one person with whom the police were talking and said he was not the assailant. With reference to appellant, she testified:

"Q. And did there come a time when you saw this male officer later in the morning for a short time?

"A. I saw him outside again.

"Q. And please tell the jury—describe when you saw him outside and who was with him.

"A. Well, I want [sic] back over to my house and my dad said that they have someone else outside there, that they were questioning him. I looked out the window and I told my parents that that really looked like the man in my room. He was about 25 or 30 feet away, standing at the side. And then my mom answered the phone, and she told me that I was supposed to go to my sister's, and so I went around back.

"Q. And after you got to your sister's apartment,[3] what happened?

"A. Well, my sister and Officer Barton were looking out the window, and I went over and told Officer Barton that it looked like him. So I kept looking, and he turned toward me, I got to look at him more, and I told Officer Barton that I was 90 percent sure it was him. And I looked at him longer and, you know, I was really darn sure it was him. And they pulled out a blue sweat shirt, and then, you know, I looked at him again, his eyes, and I said, 'I'm positive. Take him down.'

"Q. Now, when you saw Mr. Sears standing there, about how far were you from him, in Peggy's apartment?

"A. About 25 feet.

"Q. [Victim], I show you what has been marked for identification as State's Exhibit No. 1.;[4] I would like you to look at it and see if you can identify it, please.

"A. I'm sure that is the sweater, because I noticed the seams were right here and the round collar that was pulled up. That is the same color, and everything is the same.

"Q. It's the sweater that Mr. Sears had on when he was in your bedroom?

"A. Yes."

The only thing arguably suggestive is the fact that the identification might be considered as a one-man show-up as distin-

---

2. "Reliability" is referred to as "the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 at 2253, 53 L.Ed.2d 140 (1977).

3. The sister's apartment was in the same apartment house and was next to victim's apartment.

4. Exhibit No. 1 was a sweater which appellant had in his possession when encountered by the police in the vicinity of victim's apartment. It was subsequently admitted into evidence.

guished from a presentation of a group of persons or photographs at the show-up.

In *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the defendant was brought to the hospital room of a stabbing victim the day after the assault. Two members of the staff of the district attorney and five police officers accompanied him. He was handcuffed to one of the police officers and was the only member of his race in the room. At the direction of one of the officers, he repeated a few words for voice identification, and the victim was asked if "he was the man." In upholding the propriety of the identification, the court said at pages 1972–1973 of 87 S.Ct.:

"'* * * The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative. The Court of Appeals, en banc, stated [2 Cir., *U. S. v. Denno*], 355 F.2d [731] at 735, "'Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, "He is not the man" could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question.'" (Footnote omitted.)

Even without an emergency in the nature of the questionable survival of the witness, on-the-scene identifications by virtue of a one-man show-up are generally allowed. Importance is attached to the necessity to exonerate those enmeshed in the incident because of their proximity to it or because of other indications of possible involvement, and importance is also attached to the fresh memory of the witness and the necessity for immediate action by the police. One court discussed the issue as follows:

"There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. The rationale underlying this is in some respects not unlike that which the law relies on to make an exception to the hearsay rule, allowing spontaneous utterances a standing which they would not be given if uttered at a later point in time. An early identification is not error. Of course, proof of infirmities and subjective factors, such as hysteria of a witness, can be explored on cross-examination and in argument. Prudent police work would confine these on-the-spot identifications to situations in which possible doubts as to identification needed to be resolved promptly; absent such need the conventional line-up viewing is the appropriate procedure." (Footnote omitted.) *Bates v. United States*, 405 F.2d 1104, 1106 (D.C.Cir.1968).

See *Spurlock v. Crist*, Mont., 614 P.2d 498 (1980); *Stewart v. United States*, 418 F.2d 1110 (D.C.Cir.1969); Annotation: Admissibility of Evidence of Showup Identification as Affected by Allegedly Suggestive Showup Procedures, 39 A.L.R.3d 791.

It is also noteworthy that in this case there was what amounted to a two-man show-up.

■ Assuming, however, that there was a suggestive element in the identification, we find that application of the five factors set forth in *Campbell v. State*, 589 P.2d 358 (1979), outweigh any corruptive effect of the suggestive identification, and that the identification has sufficient features of reli-

ability to make the identification admissible, consideration being given to the totality of the circumstances:

1. *Opportunity to view the criminal at the time of the crime.* Victim stared at the assailant's face for ten seconds before he partially covered it; she had 20/20 vision. Victim testified:

> "All of the lights were off in the house. There is a big window over my bed and the curtains were open and the sun was starting to come in, and it came in at an angle, and I could see his face."

She was able to recognize the color of his sweater and to furnish a general description of him.

2. *Degree of attention.* Although the victim was in a situation which could engender fear and other than calm observation, it could also be one in which the assailant's appearance was etched in memory. Victim testified:

> "* * * I saw his face—and when he realized, you know, that I was waking up he pulled his sweat shirt up so I wouldn't see him, but I had plenty of time to see. You don't forget a face when you wake up."

3. *Accuracy of prior description.* The general description of her assailant given by the victim immediately after the incident fit the description of appellant— young, male Caucasian, long blond hair, six feet in height. However appellant was only 5'7" in height. When arrested, he was in possession of the blue sweater which victim said he was wearing at the time of the assault.

4. *Level of certainty.* The testimony of the victim relative to her positive identification is quoted supra. Subsequent to her first identification of appellant, she identified his photograph among several photographs shown to her. She again identified him when she observed him talking to a police officer at the police station. Finally, she did so during the trial. She expressed no uncertainty as to the identification.

5. *Time interval between the crime and the confrontation.* The time was minimal— approximately 30 minutes.

Within the totality of the circumstances, the identification was reliable.

■ Appellant refers to the subsequent identifications of appellant by victim as being so impermissibly suggestive as to create a substantial likelihood of irreparable misidentification. Inasmuch as the original identification was positive and possessed of features of reliability, subsequent identifications could not have had a suggestive influence on the initial identification. Thus, we need not address the characteristics of the subsequent identifications, all of which affirmed the initial one.

## THIRD DEGREE SEXUAL ASSAULT STATUTE

Before examining the language of § 6–4–304, W.S.1977, the third degree sexual assault statute alleged by appellant to be unconstitutionally vague, two aspects of the issue as it applies to the circumstances of this case must be kept in mind.

The question here for the jury was *not* whether appellant committed the crime of third degree sexual assault but was whether he *intended* to commit such crime when he entered the dwelling without consent of the person in lawful possession of it. To be convicted, he need not even *attempt* to commit the third degree sexual assault. He need only to have *intended* to do so. *Mainville v. State,* Wyo., 607 P.2d 339 (1980). If the jury believed beyond a reasonable doubt from the evidence here placed before them that appellant intended to commit the crime of third degree sexual assault when he entered the apartment or victim's room without permission, a verdict of guilty could be returned without consideration as to whether or not he actually committed the crime of third degree sexual assault or attempted to do so.

■ Secondly, we examine the enactment to determine if it sets forth the acts or conduct required or forbidden with reasonable certainty and in a fashion whereby a person of ordinary intelligence is given fair notice that his contemplated conduct is forbidden. "* * * [V]agueness challenges to

statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand * * *." *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). We have recently set forth the measures by which a statute is examined to test its sufficiency as against a charge of vagueness. See *Sorenson v. State,* Wyo., 604 P.2d 1031 (1979). It would be redundant to repeat that there said except to set forth a summarizing quotation from *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979):

> "It is settled that, as a matter of due process, a criminal statute that 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' [citation], or is so indefinite that 'it encourages arbitrary and erratic arrests and convictions,' [citation], is void for vagueness. * * *" See *Sorensen v. State,* supra, 604 P.2d at 1033.

Turning, then, to the language of the third degree sexual assault statute, § 6–4–304, W.S.1977, it reads:

> "Any actor who subjects a victim to sexual contact under the circumstances of W.S. 6–63.2(a)(i) through (iv) [§ 6–4–302(a)(i) to (iv)] or W.S. 6–63.3(a)(i) through (vii) [§ 6–4–303(a)(i) to (vii)] under circumstances not constituting sexual assault in either the first or second degree commits sexual assault in the third degree."

To determine its full meaning, one would make reference to other provisions of the enactment (§§ 6–4–301 through 6–4–314, W.S.1977) of which it is a part. Such reference is not difficult and can certainly be accomplished by a person of ordinary intelligence. By referring to § 6–4–301, W.S. 1977, for definitions of "actor," "victim," "sexual contact" and "intimate parts" [5] and to the subsections specified in § 6–3–304, W.S.1977,[6] and inserting the information

---

5. Such definitions are set forth in § 6–4–301, W.S.1977, as follows:

"(a) As used in this act:

"(i) 'Actor' means the person accused of criminal sexual assault;

"(ii) 'Intimate parts' means the external genitalia or the perineum or the anus or the pubes of any person or the breast of a female person;

"*     *     *     *     *     *

"(vii) 'Sexual contact' means the touching for the purposes of sexual arousal, gratification, or abuse of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or the clothing covering the immediate area of the victim's or actor's intimate parts;

"*     *     *     *     *     *

"(xi) 'Victim' means the person alleged to have been subjected to a criminal sexual assault."

6. Section 6–4–302(a), W.S.1977, reads as follows:

"(a) Any actor who inflicts sexual penetration or sexual intrusion on a victim commits a sexual assault in the first degree if:

"(i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement; or

"(ii) The actor causes submission of the victim by threat of death, serious bodily injury, extreme physical pain or kidnapping to be inflicted on any one and the victim reasonably believes that the actor has the present ability to execute these threats; or

"(iii) The victim is physically helpless, and the actor knows or should reasonably know the victim is physically helpless and the victim has not consented; [or]

"(iv) The actor knows or should reasonably know that the victim through a mental illness, mental deficiency or developmental disability is incapable of appraising the nature of the victim's conduct."

Section 6–4–303(a), W.S.1977, reads as follows:

"(a) Any actor who inflicts sexual penetration or sexual intrusion on a victim commits sexual assault in the second degree if, under circumstances not constituted sexual assault in the first degree:

"(i) The actor causes submission of the victim by threatening to retaliate in the future against the victim or the victim's spouse, parents, brothers, sisters or children, and the victim reasonably believes the actor will execute this threat. 'To retaliate' includes threats of kidnapping, death, serious bodily injury or extreme physical pain;

"(ii) The actor causes submission of the victim by any means that would prevent resistance by a victim of ordinary resolution;

"(iii) The actor administers, or had knowledge of someone else administering to the victim, without the prior knowledge or consent of the victim any substance which substantially impairs the victim's power to appraise or control his conduct;

therefrom in place of the defined words and references in such section, the same would read substantially as follows insofar as application of the facts of this case is concerned:

> Any person accused of criminal sexual assault who subjects a person alleged to have been subjected to a criminal sexual assault to a touching of the former's external genitalia by the latter for the purposes of sexual arousal or gratification, under circumstances in which the latter does not give free, full and reasoned consent, but without sexual intercourse, cunnilingus, fellatio, analingus, anal intercourse or other intrusion into the genital or oral openings of another person by other than the mouth, tongue or penis commits sexual assault in the third degree.

That prohibited is plain and easily understood by a person of ordinary intelligence.

The general distinction made by the legislature between sexual assault in the first, second and third degrees is found in the requirement of sexual penetration or sexual intrusion [7] for sexual assaults of the first and second degrees whereas the requirement is for sexual contact [8] for sexual assault in the third degree.

■ Inasmuch as the statute gives a man of ordinary intelligence fair notice that his contemplated conduct would fall within that forbidden by such statute, it is not unconstitutionally vague. Certainly appellant knew that his conduct in victim's room came within that forbidden by the statute. See *Sorenson v. State*, supra.

Affirmed.

THOMAS, Justice, concurring, with whom ROSE, Chief Justice, joins.

I concur with the result reached by the majority opinion and with that said therein concerning the propriety of identification. I do not believe it appropriate to address the issue relative to the constitutionality of § 6–4–304, W.S.1977, the third degree sexual assault statute, inasmuch as the issue was not raised until after trial and before sentencing. Generally, we will not consider matters on appeal which have not been considered by the trial court. *City of Rock Springs v. Police Protective Association*, Wyo., 610 P.2d 975 (1980); *Zwick v. United Farm Agency, Inc.*, Wyo., 556 P.2d 508 (1976); *Mercer v. Thorley*, 48 Wyo. 141, 43 P.2d 692 (1935).

---

"(iv) The actor knows or should reasonably know that the victim submits erroneously believing the actor to be the victim's spouse;
"(v) At the time of the commission of the act the victim is less than twelve (12) years of age and the actor is at least four (4) years older than the victim;
"(vi) The actor is in a position of authority over the victim and uses this position of authority to cause the victim to submit; or
"(vii) The actor inflicts sexual penetration or sexual intrusion in treatment or examination of a victim for purposes substantially inconsistent with reasonable medical practices or in a manner substantially inconsistent with reasonable medical practices."

7. "Sexual intrusion" and "sexual penetration" are defined in § 6–4–301, W.S.1977, as follows:
"(viii) 'Sexual intrusion' means any intrusion, however slight, by any object or any part of a person's body, except the mouth, tongue or penis, into the genital or anal opening of another person's body if that sexual intrusion can reasonably be construed as being for the purposes of sexual arousal, gratification or abuse;
"(ix) 'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, analingus or anal intercourse with or without emission;"

8. See fn. 5 for statutory definition of "sexual contact."