Henry McCONE, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 93–50.

Supreme Court of Wyoming.

Dec. 30, 1993.

Rehearing Denied Feb. 2, 1994.

Leonard D. Munker, State Public Defender, Deborah Cornia, Appellate Counsel, argued, and Bobbi Renner, Laramie, representing appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., and Barbara L. Boyer, Sr. Asst. Atty. Gen., argued, representing appellee.

Before THOMAS, CARDINE, GOLDEN, and TAYLOR, JJ., and McEWAN, District Judge (Retired).

CARDINE, Justice.

Henry L. McCone was convicted of four counts of making terroristic threats in violation of W.S. 6-2-505, for telephone calls made to the Bethesda Care Center and a police dispatcher in Laramie, Wyoming. On appeal he raises issues concerning: (1) vagueness and overbreadth, (2) jurisdiction and venue, (3) due process in identifying McCone, (4) instructing the jury on the law of the case and on lesser included crimes, (5) witnesses commenting on another's credibility, (6) victim impact testimony, (7) other bad acts testimony, (8) hearsay, (9) closing arguments, and (10) sufficiency of the evidence.

We affirm.

McCone presents the following issues:

ISSUE I

Whether Wyoming Statute § 6-2-205 [sic] is unconstitutional because it is vague and overbroad.

ISSUE II

Whether the Second Judicial District Court had jurisdiction and was proper venue.

ISSUE III

Whether Appellant was denied due process when witnesses identified his voice from unnecessarily suggestive procedures.

ISSUE IV

Whether Appellant was denied a fair trial when the trial court incorrectly instructed the jury on the law of the case.

ISSUE V

Whether the district court denied Appellant the right to a fair trial when it refused to instruct the jury on the lesser-included offense of threatening telephone calls.

ISSUE VI

Whether witness testimony concerning the credibility and truthfulness of the appellant was error per se.

ISSUE VII

Whether the prosecution violated Wyoming Rules of Evidence 401 and 403 by eliciting improper victim impact testimony at trial.

ISSUE VIII

Whether the trial court erred when it allowed evidence of Appellant's other bad acts under Wyoming Rules of Evidence 404(b).

ISSUE IX

Whether the trial court erred when it ruled that Officer Marti's report was inadmissible under W.R.E. 803(6), the business records exception to the hearsay rule.

ISSUE X

Whether Appellant was denied his right to a fair trial when the prosecutor made improper remarks in closing arguments.

## ISSUE XI

Whether the evidence produced at trial was sufficient to prove beyond a reasonable doubt that Appellant committed terroristic threats.

## I. FACTS

On July 19, 1992, the Bethesda Care Center (Bethesda), a nursing home in Laramie, Wyoming, received two unusual phone calls. Lori Middleton (Middleton), a staff nurse at Bethesda, answered both of these calls. Middleton testified that the first call (hereinafter call # 1) came around 8:00 p.m. from a male calling himself Antonio, who asked to speak with Teresa Landkamer (Landkamer), another Bethesda employee, about bad checks. Landkamer could not come to the phone, and the conversation ended. At around 9:40 p.m. that same evening, Antonio called again (hereinafter call # 2) asking to speak with Landkamer. Middleton described the 30 to 40 second conversation as follows:

I told him [the caller] that she was working and I could give her a message. He told me that he wanted to talk to the [expletives] and if I didn't get her on the phone he would come up there and blow my [expletive] head off.

Middleton put the caller on hold, but he hung up before Landkamer could come to the phone.

Immediately after call # 2, Middleton contacted the Laramie police; and the Bethesda facility was secured through a "lock down" procedure. A Laramie police officer came to the facility and interviewed Middleton that same evening.

The following day, July 20, 1992, Bethesda received two more threatening calls. The first was answered by Nesta Patzer (Patzer), Bethesda's office manager, and the second by Laura White–Mohseni (White–Mohseni). Patzer testified that the caller on the first call on July 20 (hereinafter call # 3) threatened to place a bomb at Bethesda within 24 hours if the caller did not get his money. White–Mohseni described the second call on July 20 (hereinafter call # 4) as follows:

This is Tonio from Denver, unless Teresa Landkamer pays 2,000 owed for cocaine I will place a bomb in Bethesda Care Center within 24 hours.

After these calls, the police were contacted; and Officer Donnelly, a Laramie police officer trained in explosives and bomb threat management, visited Bethesda.

While investigating at Bethesda on July 20, Officer Donnelly interviewed Landkamer. She suggested that McCone could be the caller because she had received harassing phone calls from McCone, her ex-boyfriend, in the recent past. Landkamer, within an hour after Officer Donnelly arrived at Bethesda, retrieved a tape recording she had made previously of a phone conversation with McCone. Officer Donnelly then played this tape for White–Mohseni, the receiver of call # 4, in an enclosed office at Bethesda. White–Mohseni testified that when she listened to the tape she was not aware whose voices were on the tape but that she later learned they belonged to Landkamer and McCone. She also testified that she identified the male voice on the tape as the same voice she heard on call # 4. That evening, the Laramie police placed an officer at Bethesda for security.

On July 21, 1992, the Laramie police dispatcher received another threatening phone call concerning Bethesda (hereinafter call # 5). This time the caller stated that a bomb would go off in 56 minutes at Bethesda. Bethesda was contacted and immediately began evacuating the facility's 120 patients. Officer Donnelly was also contacted and dispatched to Bethesda, where he stopped the evacuation because he believed the threat was a hoax. Donnelly and some of Bethesda's staff searched the facility and located nothing unusual, and then Donnelly went to the Laramie Police Dispatch Center.

Like all calls received by the Laramie police dispatcher, call # 5 was recorded. After returning to the dispatch center, Officer Donnelly listened to the tape recording of call # 5 and recognized the caller as McCone based upon past encounters with McCone. Later that day, Officer Donnelly and another officer arrested McCone at his residence in

Laramie. McCone was released the following day, July 22, 1992.

The day after McCone's release, Bethesda received another call (hereinafter call # 6), during which the caller threatened to bomb Bethesda every two weeks until the caller received his money. This call was received by Patzer, and she identified the caller as the same one who called when she answered call # 3 on July 20. After call # 6, McCone was arrested again and subsequently charged with four counts of making terroristic threats based on call # 2, call # 4, call # 5 and call # 6. After a two and a half day jury trial, McCone was convicted on all four counts.

## II. DISCUSSION

### A. VAGUENESS AND OVERBREADTH

McCone asserts that W.S. 6–2–505(a) (1988) is unconstitutionally vague and overbroad. Wyoming Statute 6–2–505(a) provides:

> (a) A person is guilty of a terroristic threat if he threatens to commit any violent felony with the intent to cause evacuation of a building, place of assembly or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such inconvenience.

McCone argues that because the statute employs both specific intent and general intent, and because the phrase "serious public inconvenience" and the term "threat" are not defined, then the ordinary person must speculate as to what conduct is prohibited.

■ When we review a statute for vagueness, we begin by determining whether the statute may be challenged "facially" or only as it applies to the challenger's conduct. *Ochoa v. State,* 848 P.2d 1359, 1363 (Wyo. 1993) (*citing Griego v. State,* 761 P.2d 973, 975 (Wyo.1988)). We review a statute "facially," *i.e.,* we examine the statute in light of how it might be applied to situations other than the challenger's, only if the statute "reaches a substantial amount of constitutionally protected conduct," or if the statute specifies no standard of conduct at all. *Griego,* 761 P.2d at 975 (*quoting Village of Hoffman Estates v. Flipside, Hoffman Estates,*

*Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982)), *see also Ochoa,* 848 P.2d at 1363. McCone asserts that W.S. 6–2–505(a) should be reviewed "facially" because it reaches a substantial amount of protected speech such as "practical jokes and groundless threats" and because it specifies no standard at all.

■ The fundamental right to speak freely, as embodied in the First and Fourteenth Amendments of the United States Constitution and Art. 1 § 20 of our Wyoming Constitution, is not without its limits. John E. Nowak and Ronald D. Rotunda, *Constitutional Law* § 16.12 at 957 (4th ed. 1991 Hornbook Series); Robert B. Keiter and Tim Newcomb, *The Wyoming State Constitution* at 59 (1993); *see also Spence v. Flynt,* 816 P.2d 771, 774–75 (Wyo.1991). Generally, government is prohibited from proscribing speech and expressive conduct based upon disapproval of the speech's or conduct's content; however, "restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality,' " are permitted. *R.A.V. v. City of St. Paul,* —— U.S. ——, —— ——, 112 S.Ct. 2538, 2542–43, 120 L.Ed.2d 305 (1992) (*quoting Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)). Speech which causes a *clear and present danger* to society is not protected. *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Nowak and Rotunda, § 16.12 at 957. Clearly, what the legislature intended to prohibit through W.S. 6–2–505(a) were violent threats which subject society to clear and present danger. The example the statute presents, *a threat to commit a violent felony with the intent to cause evacuation of a building,* cannot be categorized as a "practical joke" or a "groundless threat." Simply because creative minds are able to devise a scenario where a statute could be used to punish constitutionally protected conduct does not mean the "statute reaches a substantial amount of protected conduct." Wyoming Statute 6–2–505 does not reach a sub-

stantial amount of constitutionally protected conduct.

Wyoming Statute 6–2–505 is not a statute which has no standard at all. A statute employs a standard, for purposes of vagueness, if " 'by [its] terms or as *authoritatively construed* [it applies] without question to certain activities, but whose application to other behavior is uncertain.' " *Griego*, 761 P.2d at 976 (*quoting Smith v. Goguen*, 415 U.S. 566, 577–78, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974)). Clearly the terms of this statute apply to certain activities, *i.e.*, threatening to bomb a public facility with the intent to force evacuation of that facility.

■ Since we have determined that W.S. 6–2–505 does not reach a "substantial amount of protected conduct" and that it is not a statute with no standards at all, our review of the statute is limited to a determination of whether it is unconstitutionally vague as it applies to McCone's conduct. To determine whether W.S. 6–2–505 is unconstitutionally vague as applied to McCone, "we must decide whether the statute provides sufficient notice to a person of ordinary intelligence that [McCone's] conduct was illegal and whether the facts of the case demonstrate arbitrary and discriminatory enforcement." *Griego*, 761 P.2d at 976. In determining whether W.S. 6–2–505 provides sufficient notice, we look to the statutory language and previous court decisions which have limited or applied the statute. *Id.*

Since this court has never interpreted or reviewed application of W.S. 6–2–505, we begin by examining the language of the statute and McCone's conduct which gave rise to his four convictions. The statute prohibits threatening to commit a violent felony:

(1) with intent to cause evacuation of a building, place of assembly or facility of public transportation, or otherwise to cause serious public inconvenience, or

(2) in reckless disregard of the risk of causing such inconvenience.

McCone was charged with threatening to commit a violent felony in reckless disregard of causing serious public inconvenience, such as evacuation of a building, etc. McCone asserts that a person of ordinary intelligence

is not put on notice as to what "serious public inconvenience" entails. Although the phrase "serious public inconvenience" is not specifically defined, the statute provides an example—evacuation of a building, etc. In the case of McCone's charged conduct—an imminent bomb threat directed at a nursing home facility—a person of ordinary intelligence would be aware that a serious public inconvenience, such as evacuation of the nursing home's elderly patients, could occur and therefore also understand that his or her conduct violated W.S. 6–2–505. In addition, the record does not reflect arbitrary and discriminatory enforcement. Therefore, we hold that W.S. 6–2–505, as it was applied to McCone's conduct, is not unconstitutionally vague.

■ Statutes which target unprotected speech "but could be construed as impermissibly constraining some protected [speech] must be substantially overbroad to facially void the statute." *Ochoa*, 848 P.2d at 1364. Since we have already determined that W.S. 6–2–505 does not reach a substantial amount of protected conduct, it is clear that the statute is not substantially overbroad and therefore is not facially overbroad. *Village of Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. at 1191.

McCone does not argue that W.S. 6–2–505 is overbroad as it applies to his charged conduct. In fact, in his brief, McCone "concedes that bomb threats or threats to physically hurt a person, made in a serious and imminent context, are not protected speech." This is exactly what W.S. 6–2–505 forbids and precisely what McCone accomplished by threatening to bomb Bethesda and shoot one of Bethesda's employees.

### B. JURISDICTION & VENUE

■ McCone next argues that the district court lacked jurisdiction and did not have proper venue over the case because neither the place where the crimes were committed nor the corpus delicti of the crimes were ever established. Concerning venue, W.S. 1–7–102 (1988) provides:

(a) Every criminal case shall be tried in the county in which the indictment or of-

fense charged is found, except as otherwise provided by law.

(b) When the location of a criminal offense cannot be established with certainty, venue may be placed in the county or district where the corpus delicti is found, or in any county or district in which the victim was transported.

The Wyoming Constitution, Art. 1, § 10, provides in part:

In all criminal prosecutions the accused shall have the right * * * to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed. When the location of the offense cannot be established with certainty, venue may be placed in the county or district where the corpus delecti [delicti] is found, or in any county or district in which the victim was transported.

McCone asserts that the place of origin of each of these threatening phone calls is where the offenses were "found" or "committed," and since the places of origin for the calls were never established, then venue is proper only where the corpus delicti was found. However, the location of each of the charged crimes, i.e., where they were found or committed, was established with certainty. Although the phone calls may have originated elsewhere, each phone call was received and heard within Albany County.

In Hopkinson v. State, 632 P.2d 79 (Wyo. 1981), we held that Wyoming had jurisdiction to try an individual for accessory to murder when the accessorial acts were committed through a phone line into Wyoming. In reaching that conclusion we stated:

Many accessorial acts were actually committed in Wyoming in that it was in this state that the numerous phone calls were completed just as surely as though the appellant was standing on Wyoming soil when he communicated his requests and instructions to his agents and they were carried out. The telephone transmitted his presence into this jurisdiction where he could manipulate and play his local pawns.

Hopkinson, 632 P.2d at 100.

This reasoning applies equally to the facts of this case. McCone, regardless of where he dialed the phone, was transmitted into Albany County by the telephone, where his words were heard and had effect. See also State v. Levand, 37 Wyo. 372, 380–81, 262 P. 24 (1927) (holding that venue for a criminal libel prosecution is proper where the alleged libel was printed or circulated). McCone's actions, theoretically, are no different than the famous law school hypothetical where one person shoots from one jurisdiction and hits another person who is located in a different jurisdiction. In that scenario it has been held that the state where the criminal act takes effect, i.e., the bullet entering the victim, has jurisdiction and venue. Simpson v. State, 17 S.E. 984 (Ga.1893).

Therefore, we hold that W.S. 1–7–102 and Art. 1, § 10 of the Wyoming Constitution grant venue and jurisdiction in the county where McCone made the phone call or where the phone call was received because the threats took effect in the county where they were received.

## C. IDENTIFICATIONS

■ McCone claims that he was denied due process of law when the district court admitted pre-trial and in-court voice identifications because they were obtained through unnecessarily suggestive procedures and were unreliable. This court follows the United States Supreme Court's two-pronged approach when determining whether witness identifications violate due process. Green v. State, 776 P.2d 754, 756 (Wyo.1989); Sears v. State, 632 P.2d 946, 948–49 (Wyo.1981). First, we determine whether the identification procedures were unnecessarily suggestive, i.e., was the procedure surrounding the identification suggestive and if so were there good reasons why less suggestive procedures were not used. See generally, Wayne R. LaFave and Gerald H. Israel, 1 Criminal Procedure § 7.4(b) at 581 (1984) (citing Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). Second, if we determine that the identification procedures were unnecessarily suggestive, we look to the totality of the circumstances to discern whether the unnecessarily suggestive identification was otherwise reliable. Green, 776 P.2d at 756. In other words we

weigh a number of factors against the corrupting influence of the identification procedure. We consider whether time and environmental conditions gave the witness an ample opportunity to view the perpetrator of the crime at the scene. We also examine the degree of the witnesses' attention to the perpetrator at that time, giving due regard to whether the witness was casually or intimately involved in the criminal event, and whether the witness had any special training or experience in making observations or identifications. Next, we analyze the accuracy of any description the witness may have given prior to identifying a suspect, in terms of the time lapse between the event and the description, the extent of the characteristics described, and the extent to which those characteristics peculiarly identify the suspect. Finally, we consider the certainty with which the witness identified the suspect and the time that elapsed between the criminal encounter and the later identification.

*Green,* 776 P.2d at 756. If we conclude that the identification was unnecessarily suggestive and not sufficiently reliable, then admission of the identification is violative of due process.

■ McCone asserts that several pre-trial identifications and several in-court identifications violated due process. The pre-trial identifications were made by Patzer, White–Mohseni and Officer Donnelly. On July 20, 1992, Landkamer provided Officer Donnelly with a tape recording of an alleged conversation between Landkamer and McCone. Officer Donnelly played that tape for both Patzer and White–Mohseni, both of whom identified the male voice on the recording as the same voice from the threatening phone calls they received while at Bethesda. Landkamer's tape was the only male voice played for purposes of these identifications, and both Patzer and White–Mohseni may have been aware of who was on the tape before listening to the tape. Officer Donnelly's pre-trial identification was based on a comparison of the dispatcher's recording of call #5 and past encounters he had with McCone.

These identification procedures were suggestive because they involved only one voice, not a line-up of voices, and because Patzer and White–Mohseni may have known it was McCone's voice before listening to the tape. The State claims that these suggestive identifications were necessary because an emergency situation existed due to the nature of the crimes. A number of courts have held that "on-the-scene identification procedures [made] shortly after the crime" are suggestive but not unnecessarily and therefore are not violative of due process. *State v. Walton,* 424 N.W.2d 444, 447 (Iowa 1988) (*citing Johnson v. Dugger,* 817 F.2d 726 (11th Cir. 1987)); *see also Sears v. State,* 632 P.2d at 949 (*citing Bates v. United States,* 405 F.2d 1104, 1106 (D.C.Cir.1968)).

In *Walton,* a police officer arranged a brief telephone conversation between the suspect and a police dispatcher within an hour of a previous incriminating call made by a male caller to the dispatcher. After the arranged conversation was completed, the dispatcher was able to positively voice identify the suspect as the male caller who had previously called the dispatcher and incriminated himself. *Walton,* 424 N.W.2d at 446. The Iowa Court upheld the admission of the voice identification because a quick voice comparison was needed while the dispatcher had a fresh memory of the original male caller's voice. *Id.,* at 447.

In *Sears,* this court stated:

Even without an emergency in the nature of the questionable survival of the witness, on-the-scene identifications by virtue of a one-man show-up are generally allowed. Importance is attached to the necessity to exonerate those enmeshed in the incident because of their proximity to it or because of other indications of possible involvement, and importance is also attached to the fresh memory of the witness and the necessity for immediate action by the police.

*Sears,* 632 P.2d at 949. This is one of those situations where an "on-the-scene one-man show-up" was necessary because the witnesses had only brief conversations with the caller and a voice comparison would be most reliable if their memories were still fresh and because an emergency existed in preventing imminent threats of violence. Therefore, we

hold that these pre-trial identifications made by Patzer, White–Mohseni and Officer Donnelly were suggestive out of necessity and their admission into evidence was not violative of due process.

■ Even if these pre-trial identifications were unnecessarily suggestive, under the totality of the circumstances, their suggestiveness did not outweigh their reliability because: (1) both Patzer and White–Mohseni were direct aural witnesses to the threats which were the bases for two of McCone's convictions; (2) Patzer and White–Mohseni both received violent threats, which would suggest a high degree of attention and Officer Donnelly had several past law enforcement encounters with McCone, also suggesting a high degree of attention; (3) Patzer and White–Mohseni made comparisons within an hour of receiving the threatening calls and Officer Donnelly within a couple of hours of call # 5, and (4) each of these pre-trial identifications was positive at the time they were made.

■ McCone also asserts that several in-court identifications violated due process. The only in-court identification which appears unnecessarily suggestive was completed by witness Middleton, who had not made a pre-trial identification. During her direct testimony, Middleton listened to the police dispatcher's tape of call # 5 and then identified the male voice heard on that tape as the same voice she heard when answering call # 2. Middleton's in-court identification's reliability outweighed whatever suggestiveness may have existed because she had ample opportunity to hear the voice of the caller during call # 1 and call # 2, her degree of attention was high due to the threatening nature of call # 2, and she was positive in her identification at trial.

## D. INSTRUCTIONS

■ McCone argues that the district court erred when it instructed the jury concerning the elements of W.S. 6–2–505 and when it refused to instruct the jury on a lesser included offense. It is essential that the jury be instructed on the required elements of the crime charged and a failure to do so may amount to plain error. *Vigil v.*

*State,* 859 P.2d 659, 662 (Wyo.1993). Since McCone failed to preserve this alleged error at trial, we search only for plain error. *Id.*

Instructions Nos. 12, 13, 14 and 15 covered the required elements of each count of W.S. 6–2–505 with which McCone was charged. W.S. 6–2–505 provides:

> (a) A person is guilty of a terroristic threat if he threatens to commit any violent felony with intent to cause evacuation of a building, place of assembly or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such inconvenience.

Each of the four instructions which described the elements of W.S. 6–2–505 included, as the third element, the following statement of the law:

> 3. In reckless disregard of the risk causing the evacuation of a building or otherwise causing a serious public inconvenience.

McCone asserts that "reckless disregard" does not apply to the phrase "evacuation of a building" because of the use of the disjunctive term "or." The State counters, arguing that McCone's argument would render the term "otherwise" superfluous and meaningless.

■ The State's argument is correct. The conduct proscribed by the statute is twofold. First, it proscribes a *threat to commit any violent felony with the intent to cause evacuation of a building, place of assembly or facility of public transportation, or otherwise to cause serious public inconvenience.* By the use of the term "otherwise," the statute implies that "evacuation of a building, place of assembly or facility of public transportation" are illustrations of a "serious public inconvenience." This construction is supported by the American Law Institute, Model Penal Code § 211.3, which is substantially similar to W.S. 6–2–505 and from which W.S. 6–2–505 was drafted. *See,* Theodore E. Lauer, *Goodbye 3–Card Monte: The Wyoming Criminal Code of 1982,* 19 Land & Water L.Rev. 107, 134 (1984).

Model Penal Code § 211.3 provides:

A person is guilty of a felony in the third degree if *he threatens to commit any crime of violence with purpose* to terrorize another or *to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such* terror or *inconvenience.* [emphasis added]

Comment 2 of Model Penal Code § 211.3 states as follows:

Specifically, the section requires that the actor threaten to commit a crime of violence. These include the homicide and assault offenses, some versions of rape and other sexual crimes, kidnapping, robbery, and arson. The actor must communicate threat of such harm with a purpose to cause terror or serious public inconvenience or at least in reckless disregard of the risk of causing such harms. *The provision specifies "evacuation of a building, place of assembly, or facility of public transportation," as an illustration of serious public inconvenience.* [emphasis added]

■ The second proscribed conduct is *a threat to commit any violent felony in reckless disregard of the risk of causing such inconvenience.* The term "such inconvenience" refers to the previously mentioned "serious public inconvenience." As we have already stated, "evacuation of a building, etc." is an illustration of a "serious public inconvenience." Therefore, "evacuation of a building, etc." can be substituted for "such inconvenience." Hence, one who threatens to commit a violent felony in reckless disregard of the risk of causing evacuation of a building is guilty of a terroristic threat under W.S. 6–2–505, and the court's instructions were not plainly erroneous.

■ McCone also asserts that the district court erred in denying his request for an instruction on the elements of W.S. 6–6–103(b)(ii) (threatening telephone calls) as a lesser included crime. At the time this case was tried, one statute was necessarily included in another and therefore, a lesser included crime if "the elements of the lesser offense [were] identical to part of the elements of the greater offense." *Eatherton v. State,* 761 P.2d 91, 94 (Wyo.1988). Explained in other words, "every element of the lesser offense must be included in the greater, that is one cannot commit the greater offense without also necessarily committing the lesser offense." *Craney v. State,* 798 P.2d 1202, 1205 (Wyo.1990) (*quoting Seeley v. State,* 715 P.2d 232, 238 (Wyo.1986)). Recently, in *State v. Keffer,* we adopted the statutory elements test for determining when one statute is necessarily included in another statute; it provides:

"one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the greater offense, no instruction is to be given * * *."

*State v. Keffer,* 860 P.2d 1118, 1134 (Wyo. 1993) (*citing Schmuck v. United States,* 489 U.S. 705, 716, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989)). Under either of these tests, W.S. 6–6–103 is not a lesser included crime of W.S. 6–2–505.

W.S. 6–6–103(b) (1988) provides:

(b) A person commits a misdemeanor punishable by imprisonment for not more than one (1) year, a fine of not more than one thousand dollars ($1,000.00), or both, if:

\* \* \* \* \* \*

(ii) He telephones another and threatens to inflict injury or physical harm to the person or property of any person.

Not all of the elements of W.S. 6–6–103(b)(ii) are found within W.S. 6–2–505. Wyoming Statute 6–6–103(b)(ii) requires (1) an actor, (2) who telephones another, and (3) threatens to inflict injury or physical harm to the person or property of another. The elements of W.S. 6–2–505, with which McCone was charged, were: (1) an actor, (2) who threatens to commit a violent felony, (3) in reckless disregard of the. risk of causing the evacuation of a building or otherwise causing a serious public inconvenience.

The State can prove W.S. 6–2–505 without proving W.S. 6–6–103. For example, if the

State proves that a person threatened a violent felony in reckless disregard of the risk of causing an evacuation, they have proved the elements of W.S. 6–2–505 but not the elements of W.S. 6–6–103 because there is no proof that the threat was telephoned. Therefore, the elements of W.S. 6–6–103 are not identical to nor a subset of the elements of W.S. 6–2–505, and W.S. 6–6–103 is not a lesser included crime. The district court properly refused McCone's requested lesser included instruction.

## E. TESTIMONY ON WITNESS CREDIBILITY

■ During the cross-examination of Officer Donnelly, McCone's counsel questioned Donnelly about the initial arrest of McCone and the following exchange occurred:

[McCone's Counsel]: Your testimony was that you approached his residency and you then placed him under arrest before you spoke with him?

[Officer Donnelly]: That's correct.

[McCone's Counsel]: Then after he was arrested he agreed—after he was arrested, he agreed to talk to you?

[Officer Donnelly]: That's correct.

[McCone's Counsel]: So did you ever ask him where he was on the afternoon of the 19th or the 20th or 21st or any of those?

[Officer Donnelly]: No, I did not.

[McCone's Counsel]: Why?

[Officer Donnelly]: *I've never known him to tell the truth.*

[McCone's Counsel]: Your Honor, I move for a mistrial at this point. [emphasis added]

McCone asserts that Officer Donnelly's statement, "I've never known him to tell the truth," was error because it invaded the province of the jury—witness credibility. McCone is correct, witness credibility "is the exclusive province of the jury"; and neither expert nor lay witnesses should be permitted to testify that another witness is or is not telling the truth. *Zabel v. State,* 765 P.2d 357, 362 (Wyo.1988); *Stephens v. State,* 774 P.2d 60, 68 (Wyo.1989); *see also* Michael H. Graham, *Federal Practice and Procedure:*

*Evidence* § 6661 at 323–26 (1992 interim edition).

■ The State argues that even assuming Officer Donnelly's comment was error, it was invited by the defense counsel. A testimonial error is considered invited where the objectionable testimony is responsive to a question posed by the objecting party's counsel. *Pack v. State,* 571 P.2d 241, 247 (Wyo. 1977) (*citing State v. Maggard,* 104 Ariz. 462, 465, 455 P.2d 259, 262 (1969)). When on cross-examination counsel asks "why," he opens the door for a range of responses that are almost without limit which, because the question is open and so broad, almost always can be said to be responsive. Officer Donnelly's answer, from his viewpoint, was clearly responsive to counsel's question. Nevertheless, the above does not give license to law enforcement representatives to in bad faith volunteer seemingly prejudicial information. What happened here did not violate the rule nor did it involve serious prejudice. *See Whiteplume v. State,* 841 P.2d 1332, 1339 (Wyo.1992). In this case the police officer was asked to volunteer his personal reason for a course of action and did so. Counsel is hardly in a position to complain.

Invited errors are "not normally grounds for reversal unless they go beyond a pertinent reply or are necessarily prejudicial." *Sanville v. State,* 593 P.2d 1340, 1345 (Wyo. 1979). Officer Donnelly's statement was responsive; and because the trial court immediately instructed the jury to ignore Officer Donnelly's opinion on McCone's veracity, it was not necessarily prejudicial.

## F. VICTIM IMPACT TESTIMONY

McCone argues that testimony concerning the individual reactions of Middleton, Patzer, White–Mohseni and Bethesda residents were improper victim impact statements (VIS) because it was irrelevant or its probative value was outweighed by its prejudice. The State claims the testimony was probative of "the risk of causing a public inconvenience."

As recognized by the parties, the key inquiry on the admissability of VIS during the guilt phase of a criminal trial is relevancy. *Barnes v. State,* 858 P.2d 522, 534 (Wyo. 1993). "VIS may be irrelevant if offered

during the guilt phase of the trial as proof of" the victim's loss, the physical, emotional, or psychological impact of the victims, or of "the effect upon the family. Yet it may be relevant if offered for another proper purpose." *Barnes*, at 534.

■ The testimony in this case was relevant because it was probative of the risk of serious public inconvenience and was not unduly prejudicial. The testimony described the atmosphere at Bethesda as well as individual reactions of the residents and the employees at Bethesda after the calls were made. Contrary to McCone's assertion, the reactions of individual residents and employees demonstrated how the public—the residents and employees—was inconvenienced and the seriousness of that inconvenience. The district court neither abused its discretion nor violated a clear rule of law when it admitted testimony concerning the impact of these threatening calls on the individuals at Bethesda.

### G. W.R.E. 404(b)

McCone asserts that the district court erred in admitting testimony by Landkamer alleging that McCone continually harassed her for months before the calls to Bethesda, testimony that her car tires were slashed and McCone was the only person angry with her, and a tape recording of McCone allegedly threatening Landkamer over the phone. McCone argues that this other bad acts evidence was more prejudicial than probative based on the five factor balancing test.

Wyoming Rules of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

If a legitimate basis exists for the trial court's admission of evidence of other bad acts, the trial court will not have abused its discretion. *Wehr v. State*, 841 P.2d 104, 108 (Wyo.1992). In addition to the exceptions listed in W.R.E. 404(b), evidence of other bad acts is admissible "if it 'forms part of the history of the event or serves to enhance the natural development of the facts.'" *Crozier v. State*, 723 P.2d 42, 49 (Wyo.1986). But the probative value of this evidence must outweigh its prejudicial effect. *Id.*, at 50. In determining the admissibility of W.R.E. 404(b) evidence we weigh the following five factors:

> 1. The extent to which the prosecution plainly, clearly, and convincingly can prove the other similar [bad acts];
> 2. The remoteness in time of those [bad acts] from the charged offense;
> 3. The extent to which the evidence of other [bad acts] is introduced for a purpose sanctioned by W.R.E. 404(b);
> 4. The extent to which the element of the charged offense, that the evidence is introduced to prove, is actually at issue;
> 5. The extent to which the prosecution has a substantial need for the probative value of the evidence of the other [bad acts].

*Dean v. State*, 865 P.2d 601, 606 (Wyo.1993).

■ Landkamer's testimony about past threats and the tape recording was both clear and convincing. Landkamer was the direct object of the harassment and directly participated in the taped conversation. The harassment and the recorded threats occurred within the several months leading up to the calls to Bethesda; thus they were not too remote. Both the harassment testimony and the tape recording were introduced for reasons other than to prove McCone's character and conformity therewith. The tape and the testimony concerning harassment were offered to prove identity, and identity was a material issue at trial. Landkamer's testimony that McCone had been harassing her for several months and the tape recording, combined with the fact that in several of the threatening phone calls the caller specifically asked for Landkamer, strongly connects McCone to the Bethesda calls. Since the identity of the perpetrator was difficult to prove and a material issue, there was a substantial need for this evidence. The district court did not abuse its discretion when it admitted the tape recording and Landkam-

er's testimony about McCone's past harassment.

■ The testimony concerning the slashing of Landkamer's tires was clear in establishing that it actually happened, but it was not very convincing concerning who actually slashed the tires. The tire slashing incident was close enough to the charged conduct, two weeks after. If the evidence had been stronger in connecting McCone to the slashing, then it may have been probative of his anger at Landkamer—which infers motive for the Bethesda calls—and of a course of conduct; however, there is no evidence that McCone slashed the tires. Therefore, the admission of the tire slashing evidence was an abuse of discretion by the district court because it violated W.R.E. 404(b). However, we cannot conclude that the jury would likely have reached a different verdict had this evidence been excluded.

### H. HEARSAY

McCone asserts next that the district court erred when it excluded, as hearsay, a police report prepared by an unavailable police officer which allegedly stated that call # 6 was made from Cheyenne, Wyoming. Before proceeding to review this issue, we note that the record on appeal does not include a copy of this report. While we do not disregard this issue completely, we note that " 'it is properly [McCone's] burden to bring to us a complete record on which to base a decision,' " and without the report our review is limited to what we find in the transcript. *Matter of Estate of Manning*, 646 P.2d 175, 176 (Wyo.1982) (*quoting Scherling v. Kilgore*, 599 P.2d 1352, 1357 (Wyo.1979)).

McCone argues that this police report was admissible under W.R.E. 803(6). Wyoming Rules of Evidence 803(6) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

(6) *Records of regularly conducted activity.*—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances or preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit[.]

Therefore, to be admissible, the following is required: (1) testimony by the custodian of the report or another qualified witness which demonstrates (2) that the report was made at or near the time (3) by a person with knowledge or made from information transmitted by a person with knowledge, (4) that it was the regular practice of the Laramie police to make such a report, and (5) that this report was kept in the course of such regularly conducted business practices of the Laramie police. *See Generally*, McCormick on Evidence §§ 287–92 at 266–78 (4th ed. 1992). The report is not admissible, even if it fits the exception, if a lack of trustworthiness is indicated by the source of the report's information or by the methods or circumstances surrounding preparation of the report.

The district court did not abuse its discretion by excluding this report because there was no testimony as to whether it was made by someone with knowledge or made from information transmitted by a person with knowledge. The police officer who made the report was no longer with the Laramie Police Department and did not testify at trial. Instead, McCone's counsel tried to establish sufficient foundation through Officer Donnelly, but Officer Donnelly could only state that the other officer made the report on the day of call # 6 and did not comment on whether that officer had knowledge of the information or whether someone with knowledge of the information transmitted it. McCone argues that it is sufficient to establish this "personal knowledge" factor by showing that the Laramie police regularly base these reports upon

transmission from a person with knowledge. *See* McCormick § 290 at 275 ("evidence that it was someone's business duty in the organization's routine to observe the matter will be prima facie sufficient to establish actual knowledge"). However, we can find no such evidence in the testimony.

## I. CLOSING ARGUMENT

During his closing argument, the county prosecutor commented a number of times on the credibility of the witnesses from the trial, including McCone. McCone's counsel thrice objected to these comments, and those objections were sustained. McCone asserts that these comments so violated his due process right to a fair trial as to amount to reversible error.

We review the entirety of a closing argument to determine whether it was proper. *Virgilio v. State,* 834 P.2d 1125, 1127 (Wyo. 1992). Wide latitude should be afforded counsel in commenting on the evidence; and "absent a clear or patent abuse of discretion," the trial court's decision will not be disturbed. *Id.*

"The purpose of closing arguments is to allow counsel to offer ways of viewing the significance of the evidence." *Virgilio,* 834 P.2d at 1127 (*citing Wheeler v. State,* 691 P.2d 599, 605 (Wyo.1984)). The scope of closing arguments is limited "to preserve the prerogatives of the jury." *Barela v. State,* 787 P.2d 82, 83 (Wyo.1990). More specifically, limiting closing argument is an effort to assure that statements made by counsel are not considered evidence by the jury. *Id.* Thus, in closing argument, counsel is "entitled to reflect upon the evidence and to draw reasonable inferences from that evidence in order to assist the jury in its function." *Armstrong v. State,* 826 P.2d 1106, 1116 (Wyo.1992) (*citing Jeschke v. State,* 642 P.2d 1298, 1301–02 (Wyo.1982)).

In the case where a prosecutor is commenting on witness credibility, *i.e.,* calling the defendant a liar, we have upheld such comment when the evidence supports a reasonable inference that the defendant is a liar. *Barela,* 787 P.2d at 84 (*citing Barnes v. State,* 642 P.2d 1263, 1266 (Wyo.1982)).

However, we are concerned with the following:

When the prosecutor asserts his credibility or personal belief, an additional factor is injected into the case. This additional factor is that counsel may be perceived by the jury as an authority whose opinion carries greater weight than their own opinion: that members of the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor, an important state official entrusted with enforcing the criminal laws of a sovereign state. While the prosecutor is expected to be an advocate, he may not exploit his position to induce a jury to disregard the evidence or misapply the law.

*Barela,* 787 P.2d at 83–84 (*citing Hopkinson v. State,* 632 P.2d at 166). Within these guidelines we now examine the prosecutor's closing argument.

■ It is necessary to quote several sections of the prosecutor's closing argument to properly understand its impact. We begin when the prosecutor was discussing McCone's testimony:

[L]et's talk about the defendant's testimony. Now, you could assess his demeanor on the stand, his credibility, his motive or feelings of revenge. That instruction was read to you by His Honor. Let me take one other excerpt that I want to share with you. If you believe from the evidence in this case that any witness willfully and corruptly swore falsely to any material facts in this case then you are at liberty to disregard all or any part of his testimony. ***Did you feel the defendant ever told the truth? I could not write as fast as Mr. McCone could lie.*** [emphasis added]

McCone's counsel objected, it was sustained, and the court asked the prosecutor not to "inject personal opinion relative to trustworthiness and trustfulness." The prosecutor then continued and discussed inconsistencies in McCone's testimony including a discussion about a discrepancy concerning McCone's age, which went as follows:

He further offered an explanation as to why the computer may have his birthday wrong. He said, well, that's my brother,

my brother Henry. Okay. You have an-other brother named Henry McCone. He's like my other brother Darrel on that Bob Newhart. My other brother named Henry McCone, so you're stating, sir, that that would confuse our computer system in Laramie? Does your brother live here in Laramie? No he lives in Massachusetts. I mean, he has a child. His wife has custody of that child which she kidnapped the child, he told us. *As you listen to these stories and Mr. McCone, you begin to think that Mr. McCone lies so often that he*—[.] [emphasis added]

McCone's counsel abruptly objected and again was sustained. Lastly, the prosecutor states:

Finally, he tells you that it's not his voice on the tape that Teresa had. He says that's out of character, because, he says, I'm not profane. I don't use vulgarity. I handed him a letter which he admitted he authored, and after some denial, he said yes, it contains profanity and vulgarity. *Another inconsistency, ladies and gen-tlemen. The truth and Mr. McCone are strangers.* [emphasis added]

Again McCone's counsel objected and was sustained.

In McCone's testimony he denied having made the phone calls, presented alibis and denied that his voice was on Landkamer's tape recording, which was all contradictory to the State's evidence. Thus, witness credi-bility was an important factual issue at the trial. The evidence supported a reasonable inference that McCone was lying and that Landkamer was telling the truth. Both, the discrepancies in McCone's testimony and the fact that there was a tape recording which was alleged to be McCone's voice and the opportunity for the jury to listen to McCone's voice on the stand and compare the two, reasonably support the inference that he was lying. As we said in *Barela*, "when there is express contradictory testimo-ny, as there was here, the inference that at least one of the witnesses is lying is a reason-able one." 787 P.2d at 84. The prosecutor's closing argument was, therefore, not improp-er.

## J. SUFFICIENCY OF THE EVIDENCE

 McCone's final argument asserts that insufficient evidence was presented to support the elements of McCone's identity as the caller and that McCone acted in reckless disregard of the risk of causing evacuation of a building or otherwise causing a serious public inconvenience. When reviewing claims of insufficient evidence, we view the evidence in the light most favorable to the prosecution and determine whether it is suf-ficient to "form the basis for a reasonable inference of guilt beyond a reasonable doubt." *Geiger v. State*, 859 P.2d 665, 669 (Wyo.1993) (*quoting Broom v. State*, 695 P.2d 640, 642 (Wyo.1985)).

### 1. Call #2 (Count I)

 The evidence demonstrated that call #2 was received by Middleton and consisted of a threat to go to Bethesda and blow Middleton's head off. At trial Middleton identified the voice on the police dispatcher tape as the same voice as that from call #2, and Officer Donnelly testified that the voice on the dispatcher tape was that of McCone's. This was sufficient evidence to form the basis of a reasonable inference that McCone was the caller on call #2.

McCone also argues that there was insuffi-cient evidence to support the jury's conclu-sion that he acted in "reckless disregard of the risk of causing evacuation or serious public inconvenience" for call #2. Middle-ton's testimony concerning what the caller said—"get her on the phone [or I will] come up there and blow [your] [expletive] head off"—was sufficient for the jury to infer that the caller acted in "reckless disregard of the risk of causing evacuation or a serious public inconvenience." Although the threat in call #2 was directed at an individual not at the facility, the risk that the call would likely cause evacuation or similar serious public inconvenience remained substantial; as was demonstrated by the testimony, which re-vealed that immediately after this call the care for the residents was reduced, the police were summoned to Bethesda and the facility was, very uncharacteristically, locked down. In light of that risk, the jury could infer that making the call was reckless. Therefore,

there was sufficient evidence for the jury to convict McCone of making a terroristic threat based on call #2 (Count I).

### 2. Call #4 (Count II)

Call #4 was received by White–Mohseni and consisted of a threat to bomb Bethesda within twenty-four hours. White–Mohseni identified McCone as the caller in call #4 by identifying the voice on Landkamer's tape, which voice Landkamer testified was McCone's, as the same voice in call #4. This was sufficient for the jury to find that McCone was the caller in call #4.

Concerning proof of the element of "reckless disregard of the risk of causing evacuation or serious public inconvenience," this time the risk of causing evacuation or serious public inconvenience was even higher because the threat was very imminent and aimed at the entire facility. Therefore, the contents of this call were sufficient to form the basis of an inference that McCone recklessly disregarded the risk of causing an evacuation beyond a reasonable doubt.

### 3. Call #5 (Count III)

Call #5, like call #4, was an imminent bomb threat directed at Bethesda and was received and recorded by the Laramie police dispatcher. There was sufficient evidence to identify McCone as the caller in call #5 based on the tape recording made of the call and Officer Donnelly's identification of McCone as the voice on the tape. In addition, the recording of call #5 was played to the jury and the jury heard McCone's voice during his testimony.

Similar to call #4, we find that the evidence of call #5 provides sufficient basis to form an inference of proof beyond a reasonable doubt of the element of "reckless disregard of the risk of causing evacuation or a serious public inconvenience." Once again, the threat that a bomb would detonate within an hour at Bethesda made the risk of causing evacuation or serious public inconvenience high; thus, the making of that threat recklessly disregarded that risk.

Therefore, we find that sufficient evidence was presented to support the jury's conviction of McCone for call #5 (Count III).

### 4. Call #6 (Count IV)

Call #6 was made to Bethesda and involved a threat to place a bomb at the facility every two weeks. Call #6 was received by Patzer. At the trial Patzer testified that the caller of call #6 was the same person who appeared on Landkamer's tape. Landkamer identified McCone as the person on her tape. That is sufficient to support a reasonable inference of McCone's identity beyond a reasonable doubt.

Like the previous calls threatening a bombing, the content of this call demonstrated reckless disregard of the risk of causing evacuation or serious public inconvenience. Again the threat appeared to be imminent because the caller did not specify when he would set the first bomb, although he did say he would continue to bomb every two weeks.

### DISPOSITION

We affirm McCone's convictions.